

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

HOPE OLIVAR, Personal Representative : MDL 875
To The Estate of Eldon C. Keener, Jr. :
: CIVIL ACTION NO. 09-62577
v. :
:
BUFFALO PUMPS, INC., et al. :

### REPORT AND RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT BY DEFENDANT BUFFALO PUMPS, INC.

THOMAS J. RUETER,                           March 29, 2011
Chief United States Magistrate Judge

Plaintiff Hope Olivar, personal representative to the Estate of Eldon C. Keener, Jr. ("Mr. Keener"), originally brought this action in the Superior Court of Connecticut from where it was removed by defendants to the United States District Court for the District of Connecticut.[1] The complaint alleges that Mr. Keener was exposed to asbestos-containing pumps manufactured and sold by defendant Buffalo Pumps, Inc. ("Buffalo")[2] while serving in the United States Navy between 1939 and 1959. It is this alleged exposure that Plaintiff claims caused Mr. Keener to develop mesothelioma from which he died on December 26, 2005. Presently before the court is Buffalo's Amended Motion for Summary Judgment. The court heard oral argument on the motion on March 15, 2011. For the reasons that follow, the court recommends that the motion be

---

[1] The case was subsequently transferred to the Eastern District of Pennsylvania as part of MDL 875 and docketed on February 9, 2009, in accordance with the terms of this court's Administrative Order No. 11. See Doc. 1.

[2] Buffalo merged into Air & Liquid Systems Corporation on December 31, 2009. The former operations of Buffalo are now conducted by the Buffalo Pumps Division of Air & Liquid Systems Corporation.

granted.

I.  **LEGAL STANDARDS**

   A.  **Standard for Summary Judgment**

   Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "'genuine'. . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "material" if it might affect the outcome of the case under governing law. Id. "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact." Boykins v. Lucent Tech., Inc., 78 F. Supp. 2d 402, 408 (E.D. Pa. 2000), aff'd, 29 Fed. Appx. 100 (3d Cir. Feb. 4, 2002). The evidence presented must be viewed in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255; Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir. 1983).

   B.  **Applicable Connecticut law**[3]

---

[3]   During oral argument, Defendant argued that, under maritime law, Buffalo cannot be liable for any external asbestos insulation added to its pumps by the Navy. Plaintiff responded by stating that Connecticut law and not maritime law applies and argued that Connecticut law does not recognize the so-called "bare metal" defense. This court will not decide this issue as it is an issue reserved for Judge Robreno. For purposes of this Report and Recommendation, Connecticut law applies and the bare metal defense is not available to the Defendant. Nonetheless, for reasons stated herein, Plaintiff has not produced sufficient evidence showing that the external insulation on Buffalo's pumps caused Mr. Keener to be exposed to asbestos fibers. Plaintiff has not shown that this insulation was disturbed or cut in his presence or that it was otherwise removed from any of the Buffalo pumps. Putting aside the external insulation, the parties agree that the only other way Mr. Keener could have been exposed to asbestos-containing products supplied by Buffalo was by repairing or dismantling the pumps, or being near the work, which only then would have exposed Mr. Keener to Buffalo pumps with asbestos-containing gaskets or packing.

2

The Superior Court of Connecticut has stated that "'[i]n a products liability asbestos claim a plaintiff must: 1) identify an asbestos-containing product for which a defendant is responsible, 2) prove that he has suffered damages, and 3) prove that defendant's asbestos-containing product was a substantial factor in causing his damages.'" Heilweil v. ABB, Inc., 2004 WL 2284114, at *1 (Conn. Super. Sept. 14, 2004) quoting Roberts v. Owens-Corning Fiberglass Corp., 726 F. Supp. 172, 174 (W.D. Mich. 1989). The Supreme Court of Connecticut, when affirming a jury verdict for the plaintiff in an asbestos case, stated the following:

> Although no witnesses specifically testified that they saw the decedent handle the defendant's products, the jury reasonably could have found or inferred that he was exposed to the defendant's products based on the work that he was engaged in, the length of time that he was employed, and the fact that coworkers who performed similar work testified that they handled the defendant's products.

Champagne v. Raybestos-Manhattan, 562 A.2d 1100, 1112 (Conn. 1989).[4] See also, Cormier v. 3M Corp., 2005 WL 407641, at *2 (Conn. Super. Jan. 12, 2005)("'plaintiff must show that a particular defendant's product was used at the job site and that the plaintiff was in proximity to that product at the time it was being used.'") quoting Robertson v. Allied Signal, Inc., 914 F.2d 360, 368 n.5 (3d Cir. 1990)).

## II. DISCUSSION

It is undisputed that Mr. Keener worked as a fireman, machinist mate and chief

---

[4] Plaintiff urges the court not to follow the standard for substantial factor set forth by the United States Court of Appeals for the Fourth Circuit in Lohrmann v. Pittsburgh Corning Corp., 782 F.2d 1156 (4th Cir. 1986). Under Lohrmann, a plaintiff must establish that he worked with a certain defendant's product with the necessary frequency and regularity, and in close enough proximity to the product, to create a genuine issue of material fact as to whether the specific product was a substantial factor (and thus the proximate cause) of plaintiff's asbestos-related condition. Id. at 1162-63. In view of the fact that there is no precedent from any Connecticut state court for following the Lohrmann test, the court elects not to apply the Lohrmann standard to the facts of this case.

machinist mate in the Navy from 1939 to 1959, and that his job responsibilities included changing gaskets and packing on pumps. Mr. Keener, however, was never deposed. Furthermore, none of Mr. Keener's co-workers testified regarding Mr. Keener's exposure to asbestos products while Mr. Keener was in the Navy. Instead, Plaintiff relies solely on the expert reports of R. Bruce Woodruff, Capt. USN (Ret.) dated February, 2010, April, 2010 and July, 2010 to demonstrate that Mr. Keener was exposed to asbestos from pumps manufactured and supplied by Buffalo.

In his February, 2010 report, Captain Woodruff states, <u>inter alia</u>:

1. **Summary.** Mr. Keener served in the U.S. Navy aboard ten ships from December, 1939 to June, 1959. While serving aboard ship in the engineering departments, it is my opinion that Mr. Keener received significant exposure to asbestos during his career from substantial quantities of amosite asbestos. This was due to the proximity to amosite asbestos insulation and lagging installed on steam machinery in the confined spaces of Navy surface ships for an extended period of time. Most likely one of the prime sources was the pumps manufactured by Buffalo Pump Company which were on so many of his ships. Keener's record indicates that he served all of his service time in the Engineering Department as a Fireman Second Class (F2c) and was promoted rapidly through the ranks to Second and First Class Machinist's Mate and finally to Machinist Mate Chief Petty Officer (MMC). This would have placed him in close proximity to the Buffalo products.

2. **Career Outline**

    **Normal Fireman and Machinist Mate duties.**

    **Underway:**

    The exposure to asbestos while underway is possible, but generally considered less for engineering personnel when the ship is at sea. Without his testimony, we do not have extensive details of Mr. Keener's assignments save that he was assigned to the after engine room on the Intrepid.

    Machinist Mates with Keener's superb record, including tours at

4

Naval Training Centers, leads me to believe that his time aboard ship would have been spent in the main engineering spaces as opposed to Auxiliary Division, the "A Gang".... Machinists of his quality would have been in the main propulsion spaces.

. . . .

Mr. Keener would have been required to stand underway watch in the enginerooms [sic] twice a day in four hour shifts. Prior to being promoted to second class, his duties would have been to take various readings every hour, react to casualties and prevent any loss of vital propulsion and auxiliary equipment. When not on watch, he would perform routine maintenance of piping and valves in the engine rooms in support of the main turbines, turbo generators and distilling plants. Much of the Buffalo Pump equipment on board dealt with the evaporators and these systems were vital, ran 24/7 and were the lifeblood of a steam ship. They provided the feed water for the boilers, which produced steam in the quantities of hundreds of pounds per hour (each). As I recall from the ships I was on and my tours as a destroyer tender repair officer, the various small evaporator pumps were a frequent repair item.

**In Port:** As a Fireman and lower rated Machinist Mate, Keener would have been required to do manual labor, cleanup and routine working partly labor e.g. loading ship supplies to storerooms. A Navy ship in port is the most likely period that ship's force personnel would be exposed to asbestos products. This would have been particularly true for time spent in a shipyard. Please note the time he was onboard when his various ships were in the yard. The majority of shipyard funds were spent for repair of the engineering equipment and many were major overhaul items such as the boiler, pumps, valves and evaporators. . . .
Mr. Keener would have been subject to taking part or supervising any/all of the work in the Engineering Department that had to be accomplished during a yard period. These tasks became even more frequent and demanding when the ship was in extended shipyard overhaul. More specifically, when there was boiler, distilling plant (pumps and valves), feed systems, or main engine work being undertaken, any non-rated sailor could be made available to assist. It was common for many lower ratings in ship's forces to be tasked to remove the insulation so that the shipyard workers could gain ready access to the valves in addition, piping.

**3. Shipboard Equipment With Asbestos.**

The most direct verification of asbestos aboard ships Keener served on is clearly found in the many Bureau of Ships drawings that detail the Insulation and Lagging

> Schedules. In assessing the Keener ship documents, I reviewed multiple letters, memos, and other Navy documents that support the thesis that the ships of this era contained significant quantities of asbestos, primarily in the form of amosite. This insulation would have been on many of the Buffalo Pump products. In my personal experience as well as previous research of ships designed and built in this era, the insulation used for ships (both Navy and commercial) was amosite asbestos throughout engineering plants.
>
> . . . .
>
> **4. Asbestos on Board U.S. Navy Ships.**
>
> Whenever steam system repairs are undertaken, there is piping and valve removal and renovation, which almost always involves the removal of asbestos lagging. Personnel performing work on steam systems were exposed to a constant and pervasive source of asbestos contamination. Often in port the ships' ventilation systems would be shut down–normal exhaust and supply fans in engineering spaces cease operations and exacerbate the possible engineering space contamination.

See Report of R. Bruce Woodruff, Capt. USN (Ret.), February, 2010 at 4-8, attached to Buffalo's Mot. Summ. J. as Exh. K. Captain Woodruff also identified the following numbers of Buffalo pumps in the engineering spaces on the ships on which Mr. Keener served: USS Anderson-8; USS Harlan Dickson-9; USS William Wood-9; USS Intrepid-9; USS Antietam-9; USS Tarawa-9. Id. at 7.

In a Supplemental Affidavit[5] subscribed to by Captain Woodruff on April 28,

---

[5]  Plaintiff never sought leave to serve late discovery or expert materials, nor did she request a modification of this court's scheduling order. Instead she simply produced two affidavits from her expert witness five months after fact discovery had closed and more than four months after the deadline for expert reports had expired. As a result, Buffalo sought to exclude the two supplemental affidavits as well as Plaintiff's Supplemental Objection to Buffalo Pump's original motion for summary judgment. By Order dated January 11, 2011, the court, out of an abundance of caution, denied Buffalo's request to strike the two supplemental affidavits, but permitted Buffalo to re-depose Captain Woodruff solely as to the contents of the two supplemental affidavits. The court further permitted Buffalo to amend its original Motion for Summary Judgment following the completion of Captain Woodruff's second deposition. See

6

2010, after his deposition was taken, Captain Woodruff stated four additional opinions as follows:

> a. **Additional Buffalo Pumps**. There were additional Buffalo Pumps on the USS William Wood (DD715) that were not listed in my original report. They were all located in the engine rooms on the Wood where Mr. Keener served and would have been another additional significant source for asbestos exposure. They are:
> * Four (4) Buffalo Main Feed Booster Pumps (2 in each engine room)
> * Two (2) Buffalo Auxiliary Feed Booster Pumps (1 in each engine room)
>
> b. **Shipyard & Repair Ship (Tender) Periods.** On the William Wood (DD 715), Mr. Keener was stationed on the ship during overhaul at the Mare Island Naval Shipyard from 2 February-27 March 1949. In addition, Wood was docked at the Long Beach Naval Shipyard during August, 1949, and also had an availability alongside the Repair Ship USS Vulcan (AR-5) from 16-28 June 1950. As stated in my original report, maintenance and overhaul periods in a shipyard or alongside a tender remained the time of the highest probability of asbestos exposure for the crew. Additionally, just prior to Mr. Keener's arrival, the Navy Board of Inspection and Survey conducted a Material inspection in April 1947 and noted "the ship reported that considerable piping leaks and failure were experienced with the evaporator lines."
>
> c. **USS Anderson (DD 411) Shipyard Period.** My report listed a short shipyard period (Restricted Availability-RAV) from 16-19 June 1941 at the Philadelphia Naval Shipyard. At the time, Keener was a Second Class Fireman (F2C) and would have been involved in most of the basic maintenance tasks necessary in the engine rooms. During the Philadelphia Navy Yard RAV, an evaporator condensate cooler was retubed, and more likely than not, this would have been a 'ship to shop' job. Usually ship's force would remove such items, take them to and from the yard's Inside Machine Shop, Shop 31. This would have required disconnecting and reconnecting the lagged piping connection from the Buffalo Distillate Condensate pump—with the distillate at a normal temperature of 120 degrees F.
>
> d. **Keener's Personal Evaporator Qualifications.** Keener's

---

Doc. 57. On February 25, 2011, Buffalo in fact amended its original motion for summary judgment. See Doc. 59.

> Navy records show that on the USS Harlan R. Dickson (DD 708) he had been certified by the ship's Engineering Officer and the Commanding Officer to stand evaporator watch underway. This is an indication that he would have been familiar with and worked in the near vicinity the ship's evaporators and the five evaporator Buffalo Pumps that were in each of the engine rooms.

Supplemental Affidavit of Captain L. Bruce Woodruff, attached to Plaintiff's Opp'n to Buffalo's Mot. Summ. J. as Exh. E at 2-3. Captain Woodruff further opined that "Mr. Keener was exposed to asbestos from Buffalo Pumps machinery located on six of the nine ships on which he had significant service." Id.

In a second supplemental affidavit subscribed to on July 3, 2010, Captain Woodruff avers that Mr. Keener was exposed to 19 Buffalo pumps while serving on the USS Buckley from July 10, 1949 to January 15, 1950. (Second Supplemental Affidavit of Capt. R. Bruce Woodruff, attached to Plaintiff's Suppl. Opp'n to Buffalo's Mot. Summ. J. as Exh. B at 2-3.) Captain Woodruff opines that "Mr. Keener was exposed to asbestos from Buffalo Pumps, Inc. machinery located on seven of the ten ships on which he had significant service. The exposure could have come from the Buffalo pump asbestos insulation, asbestos gaskets and/or asbestos packing." Id.

The main flaw in Plaintiff's evidence is that she has failed to produce any fact witnesses to testify that Mr. Keener performed work on any Buffalo pump, or that anyone performed work on these pumps in Mr. Keener's presence. Instead, Plaintiff relies heavily on the reports and affidavits of her expert, Captain Woodruff, who tries to piece together from shipping records where Mr. Keener would have served aboard each of the seven Navy vessels which Captain Woodruff claimed in his second supplemental affidavit contained Buffalo pumps.

8

However, Plaintiff is using an <u>expert</u> witness to establish the <u>factual</u> (product identification and exposure) basis of her case.

More significantly, there is substantial inconsistency between what Captain Woodruff wrote in his report and what he testified to during his deposition. For example, Captain Woodruff admitted that he had not seen any documentation to support his written opinion that the evaporator-related pumps in the engine room on the USS HR Dickson and USS Wood, which he believed were manufactured by Buffalo, were actually insulated with asbestos-containing material. (Woodruff Dep. at 39-40.) In fact, Captain Woodruff admitted that the "Schedule for Insulation and Lagging for Miscellaneous Pumps" for the Sumner Gearing Class vessels did not identify any Buffalo pumps aboard the USS HR Dickson. <u>Id</u>. at 32.[6]

Captain Woodruff admitted that he did not know whether Mr. Keener was present for maintenance work performed on the evaporator condensate cooler aboard the USS Anderson or for work on any Buffalo pumps aboard that ship. <u>Id</u>. at 41-42. Captain Woodruff further conceded that even if these pumps were insulated, the pumps would not have been disturbed for only routine pump maintenance. <u>Id</u>. at 42. Captain Woodruff further testified that routine maintenance on evaporator-related pumps generally did not occur. <u>Id</u>. In fact, the only time the

---

[6]   As noted above, Captain Woodruff averred in his supplemental affidavit of April 28, 2010, that the main feeder booster pumps aboard the USS Wood were insulated by the Navy, and that the pumps themselves were supplied by Buffalo. Captain Woodruff conceded at his supplemental deposition, however, that the only support he had for his claim that the main feeder pumps were supplied by Buffalo was an undated pump allocation planning document issued by the Bureau of Ships during World War II. (Woodruff Dep., February 10, 2011 at 66-68.) Woodruff further conceded that initial pump allocations did not always result in actual pump installations during the wartime shipbuilding program. <u>Id</u>. at 68. Indeed, Navy Archive records specific to the USS Wood from 1957 reveal that the main feed booster pumps aboard the USS Wood were actually supplied by DeLaval Turbine Co. <u>See</u> Exh. C to Buffalo's Amended Mot. Summ. J.

servicemen would ever "tear into" the pumps was if something was "really wrong" with the pumps. Id. Plaintiff has failed to produce any evidence that there was anything "really wrong" with any Buffalo pump aboard a ship on which Mr. Keener served. Therefore, even if Buffalo pumps were in the engine room where Mr. Keener served on the Dickson and Wood, there is no evidence that Keener was ever exposed to any asbestos from these pumps.

Although Captain Woodruff averred that there were Buffalo pumps aboard the USS Antietam, USS Intrepid and USS Tarawa, Captain Woodruff testified that according to the only documentation he had, these pumps were located in the No. 3 Fire Room and not in the engine rooms where Mr. Keener's personnel records suggested he worked. Id. at 24-26. Captain Woodruff also agreed that Mr. Keener would not have worked on any of the airplane gasoline pumps manufactured by Buffalo, and that even if Mr. Keener had, he was not sure that these types of pumps would have contained any asbestos. Id. at 24.

Plaintiff claims that Mr. Keener "likely" was present and assisted with the "retube" of the evaporator condensate cooler in June 1941 aboard the USS Anderson, that this work "likely" would have involved Buffalo pumps, and that Mr. Keener, therefore, "would have" worked on and breathed asbestos dust released from a Buffalo pump. However, Plaintiff's own naval expert, Captain Woodruff, specifically testified at his deposition that there is simply no documentation to support such an inference. The following exchange took place during Captain Woodruff's initial deposition:

> Q. Okay. And which ship was this?
>
> A. ....This is the Anderson. And this had to do with—this is a departure report from Philadelphia—and retube the evaporator condensate cooler with copper nickel tubes. And this was somewhere in June of 1941.

> Q. Retube--I'm sorry--the what?
>
> A. The evaporator condensate cooler.
>
> Q. Is that a kind of pump?
>
> A. No it's a heat exchanger.
>
> [Y]ou don't have any information or documentation that talks about where he was stationed as a fireman aboard that ship?
>
> A. No.
>
> Q. As a fireman, he could have been in any of the machinery spaces, correct?
>
> A. Yes.
>
> Q. And you certainly don't know, based on anything you have, whether he was present for that work on the condenser that you described?
>
> A. No.

Woodruff Dep. at 40-41.

Captain Woodruff also avers in his second supplemental affidavit that certain fire and flushing pumps and main feed booster pumps were repaired at Norfolk Naval Shipyard while Mr. Keener was stationed aboard the USS Buckley. However, at his February 10, 2011 deposition, Captain Woodruff admitted that he had no evidence that Mr. Keener actually worked with these pumps or would have been involved in or present at their repair, which was done by shipyard workers. (Dep. of L. Bruce Woodruff, February 10, 2011, attached to Buffalo's Am. Mot. for Summ. J. as Exh. A at 97-100.) Woodruff further conceded that there would not have been any disturbance of asbestos during the work on the fire and flushing pumps, and that he had no way of knowing whether Mr. Keener was present when other workers disassembled the main

11

feed booster pumps to be transported to and worked on at the shipyard's machine shop. Id. at 98-101.

Plaintiff also relies on deposition testimony from Buffalo's expert on medical issues, Robert Sawyer, M.D. Specifically, Plaintiff points to Dr. Sawyer's testimony on cross-examination that it was "possible" or "probable" that Mr. Keener would have personally worked on or been around others working on Buffalo pumps during his tenures on the USS Anderson, USS Harlan Dickson, USS William Wood. (Dep of Dr. Robert Sawyer, attached to Plaintiff's Opp'n to Buffalo's Mot. Summ. J. as Exh. B at 29-31;34-35;38-40.) A closer examination of Dr. Sawyer's testimony, however, reveals that he merely assumed in response to hypotheticals posed by plaintiff's counsel that Mr. Keener had worked on insulated pumps. Id. at 35 ("assuming there was work done on the pumps and they were insulated...") Id. at 39 ("this is an exercise of speculation....", "there's a whole lot of ifs.") Specifically, the following exchange took place:

> Q. You were asked a number of questions by Mr. Meisenkothen about where he used words like the likelihood or probability or more likely than not, words of that nature. In your opinion, is it just speculation as to whether or not Mr. Keener was ever in the same engineering space as a Buffalo pump.
>
> A. On my part, it's speculation.
>
> Q. So in all the answers that you gave, it was speculation, correct in terms of whether or not Mr. Keener ever worked on a Buffalo pump?
>
> A. Yes.
>
> Q. You have no information as to whether or not any of the Buffalo pumps that Mr. Meisenkothen referenced were ever worked on by Mr. Keener or anyone in his presence. Correct?
>
> A. That's correct.

> Q. And although Mr. Meisenkothen used words like more like little than not or probability, it's actually just speculation. Is that correct?
>
> A. On my part, it's speculation.

Id. at 51-52.

Plaintiff also relies on the testimony from another Buffalo expert, Admiral Roger B. Horne, who allegedly testified that Mr. Keener would have had asbestos exposure during his time in the Navy and he could not exclude that Mr. Keener was at some point exposed to a Buffalo pump. However, once again the specifics of Admiral Hornes's testimony must be examined:

> Q. Do you have any opinion today as to whether or not Mr. Keener ever worked on any Buffalo Pumps when he was in the Navy?
>
> A. It would be speculation. You know, we talked about the kind of work he would have done, whether there was a Buffalo pump–there's a lot of pumps and a lot of different manufacturers, and there's a lot of sailors. You have to try to tie that all together and say, you know, he was a particular sailor on this particular ship that worked on that particular pump and it was a Buffalo pump. I don't, you know, I don't know that. I wouldn't exclude it either. I wouldn't bet the family farm on it either.
>
> . . . .
>
> Q. And that's probably a better way, I should have asked the question, but as of today, I think, as you just said, you do not know whether any of his ships even had Buffalo pumps; is that fair?
>
> A. That's fair.
>
> Q. And by the same token, you do not know as of today whether or not Mr. Keener did or did not work on any Buffalo Pumps?
>
> A. That's correct.

Dep. of Admiral Roger B. Horne, attached to Plaintiff's Opp'n. to Buffalo's Mot. Summ. J. as

Exh. D at 24-26.

In short, the most that Plaintiff's evidence reveals is that approximately seventy-two Buffalo pumps were installed aboard seven of the ten ships on which Mr. Keener served. It is the opinion of Captain Woodruff that because there were seventy-two Buffalo pumps on certain of the ships Mr. Keener served on, Mr. Keener might have worked on them and, if he did, he was necessarily exposed to asbestos. However, Plaintiff has not produced any evidence that Mr. Keener actually worked on a Buffalo pump or that he was in the presence of others who worked on such pumps. Even Plaintiff's expert was unable to testify that Mr. Keener would have been in the same room as a Buffalo pump, with the exception of two of the eleven ships on which he served, or that Keener was ever near any work being performed on a Buffalo pump. There is no evidence that Mr. Keener was stationed at any one spot on any one ship for a length of time. There is no evidence that Mr. Keener was exposed solely to any of the seventy-two Buffalo pumps as opposed to the hundreds of other pumps and valves which were on the eleven ships to which Mr. Keener was assigned. There are simply too many gaps in the evidence, rendering speculative the inference that Mr. Keener was exposed to any asbestos-containing product supplied by Buffalo and that any such exposure was a substantial factor in the causation of Mr. Keener's death. Although it is the jury's right to draw logical deductions and make reasonable inferences from the facts proven, it may not resort to mere conjecture and speculation. Levesque v. Bristol Hosp., Inc., 943 A.2d 430, 443 (Conn. 2008). This is exactly what a jury must do in order to find for the plaintiff on her claims against Buffalo. Summary judgment must be granted. See Nolan v. Borkowski, 538 A.2d 1031, 1036 (Conn. 1988) (Speculative evidence cannot serve as a basis for opposition to a motion for summary judgment.)

Accordingly, the court makes the following:

## RECOMMENDATION

AND NOW, this 29th day of March 2011, it is respectfully recommended that Buffalo Pumps, Inc.'s Amended Motion for Summary Judgment on the issue of product identification and causation Doc. No. 59 be **GRANTED**.

The parties may file objections to this Report and Recommendation. See Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights.

BY THE COURT:

THOMAS J. RUETER
Chief United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: ASBESTOS PRODUCTS LIABILITY LITIGATION (NO. VI)

HOPE OLIVAR, Personal Representative : MDL 875
To The Estate of Eldon C. Keener, Jr. :
: CIVIL ACTION NO. 09-62577
v. :
:
BUFFALO PUMPS, INC., et al. :

## ORDER

AND NOW, this ___ day of _____, 2011, upon careful and independent consideration of Buffalo Pumps, Inc.'s motion for summary judgment (Doc. No. 33) and amended motion for summary judgment (Doc. No. 59), Plaintiff's response (Doc. No. 39) and Defendant's Reply (Doc. No. 42) and after review of the Report and Recommendation of Chief United States Magistrate Judge Thomas J. Rueter, it is hereby **ORDERED** that:

1. The Report and Recommendation is **APPROVED** and **ADOPTED**;

2. Buffalo Pumps, Inc.'s motion for summary judgment (Doc. No. 33) and amended motion for summary judgment (Doc. No. 59) are **GRANTED**; and

3. Judgment is hereby ENTERED in favor of Buffalo Pumps, Inc. and against Plaintiff.

BY THE COURT:

_____
EDUARDO C. ROBRENO,    J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

March 29, 2011

RE: MDL 875 ASBESTOS PRODUCTS LIABILITY LITIGATION
Civil Action No. 09-62577

## NOTICE

Enclosed herewith please find a copy of the Report and Recommendation filed by United States Magistrate Judge Rueter, on this date in the above captioned matter. You are hereby notified that within fourteen (14) days from the date of service of this Notice of the filing of the Report and Recommendation of the United States Magistrate Judge, any party may file (in duplicate) with the clerk and serve upon all other parties written objections thereto (See Local Civil Rule 72.1 IV (b)). **Failure of a party to file timely objections to the Report & Recommendation shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to factual findings and legal conclusions of the Magistrate Judge that are accepted by the District Court Judge.**

In accordance with 28 U.S.C. §636(b)(1)(B), the judge to whom the case is assigned will make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. The judge may accept, reject or modify, in whole or in part, the findings or recommendations made by the magistrate judge, receive further evidence or recommit the matter to the magistrate judge with instructions.

Where the magistrate judge has been appointed as special master under F.R.Civ.P 53, the procedure under that rule shall be followed.

MICHAEL E. KUNZ
Clerk of Court

By: *Joseph Lavin*
JOSEPH LAVIN, Deputy Clerk

Courtroom Deputy to Judge Eduardo C. Robreno

civ623.frm
(11/07)